IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SPRING NICOLE GAINES, | ) | CASE NO. 3:25-cv-01859-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Spring Nicole Gaines ("Gaines") seeks judicial review of the final decision of

the Commissioner of Social Security, denying her application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge

("ALJ") applied proper legal standards, I recommend that the Commissioner's final decision

denying Gaines' SSI be affirmed.

## II.     Procedural History

Gaines protectively filed for SSI on June 16, 2023, alleging a disability onset date of

January 1, 2005. (Tr. 164-70). The claims were denied initially and on reconsideration. (Tr. 54,

66). Gaines then requested a hearing before an ALJ. (Tr. 93). Gaines, represented by counsel,

and a Vocational Expert ("VE") testified before an ALJ on August 28, 2024. (Tr. 33-53). On

September 24, 2024, the ALJ issued a written decision finding Gaines not disabled. (Tr. 14-28).

The Appeals Council denied her request for review on July 10, 2025, making the hearing

decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

Gaines timely filed this action on September 6, 2025. (ECF Doc. 1). She asserts the following assignment of error:

> The ALJ's residual functional capacity is unsupported by substantial evidence. The ALJ's finding that Plaintiff would be off task only 5% is unexplained. The ALJ's finding that Plaintiff could stand and walk for a total of four hours in an 8-hour workday is unexplained.

(*Id.* at p. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Gaines was born February 13, 1979. (Tr. 164). She was 44 years old on her alleged onset date, making her a younger individual according to agency regulations. (Tr. 59). She has at least a high school education. (Tr. 27). She has no past relevant work. (*Id.*).

#### B.    Relevant Medical Evidence

At a March 15, 2022 office visit office visit with Endocrinology and Diabetes Specialists of NW Ohio, Gaines was assessed with post-surgical hypothyroidism; controlled type 2 diabetes mellitus with diabetic nephropathy, with an A1c measuring at 5.3%; long-term insulin use; hypertriglyceridemia; and high-risk medication use. (Tr. 460-61). She underwent an MRI Cardiac Stress Test that showed no evidence of ischemia and was found to be a low-risk study. (Tr. 287). The test showed a mildly dilated left ventricle with normal LV systolic function and an ejection fraction of 65%; mildly dilated right ventricle with normal RV systolic function; mildly dilated left atrium; mild to moderate mitral valve regurgitation, with 11% regurgitation fraction; and mildly dilated pulmonary artery measuring 31 mm, with mild dilated IVC. (*Id.*).

Gaines had a follow-up examination on June 7, 2022 after undergoing a JJ Stent placement, cystoscopy, left ureteroscopy, laser lithotripsy of left ureter stone, basket stone removal, left flexible ureteroscopy, laser lithotripsy of kidney stones, and retrograde pyelogram.

(Tr. 280). She was assessed with bilateral nephrolithiasis and noted occasional flank pain. (Tr. 281). Examination showed her abdomen to be soft and non-distended, with no rebound or rigidity, with no masses or tenderness noted. (*Id.*). While endorsing diarrhea, Gaines denied stool incontinence. (Tr. 283).

On June 27, 2022, Gaines was examined by Trayton Mains, D.O., of the Mercy Health Rheumatology Department. (Tr. 539). Dr. Mains noted Gaines' medical history included arthritis, asthma, Barrett's esophagus, cystitis, duodenitis, fibromyalgia, history of HPV infection, irritable bowel syndrome ("IBS"), hypothyroidism, interstitial cystitis, kidney stone, mental disorder, nonalcoholic steatohepatitis ("NASH"), thyroid disease, and ulcerated colon, and indicated she was being evaluated for systemic lupus. (*Id.*). She reported symptoms of constipation and diarrhea, intermittent psoriasis plaques, fissure/crack in tongue, sicca in eyes and mouth, arthralgia, and pain in her bilateral hands, wrists, elbows, shoulders, lower back, hips knees, and ankles. (*Id.*). She also reported morning stiffness typically lasting 30 to60 minutes. (*Id.*).

Gaines met with Treacy Hueve, LISW on July 5, 2022. (Tr. 427). Gaines reported that her Buspar had previously helped her manage her mental health symptoms, but she had been without it for about one year. (*Id.*). She reported feeling overwhelmed at times, and, although Venlafaxine was helping her manage her depression, she still feels down intermittently. (*Id.*). Her depression symptoms included feeling down, unmotivated, low energy, isolation, sleep disturbance, intermittent loss of interest in activities, fair energy levels, and racing thoughts. (*Id.*).

On August 29, 2022, Gaines attended an appointment with Brittany Leininger, APRN-CNP, of Mercy Health's Rheumatology Department, reporting that she had pain in her left

shoulder, back, and hands that rated 3/10 on the pain scale. (Tr. 526-27). She continued to experience morning stiffness, and was positive for fatigue, diarrhea, arthralgias, back pain, myalgias, neck pain, rash, and numbness in her fingers and toes. (Tr. 527). At a subsequent follow up appointment with CNP Leininger on November 1, 2022, Gaines stated that her morning stiffness had improved with Tremfya, but she was experiencing side effects since starting a prescription for Jardiance. (Tr. 519). Gaines was assessed with systemic lupus vs. spondyloarthritis ("SpA") overlap; thrush; NASH with fibrosis; and carpal tunnel syndrome with positive bilateral phalen signs. (Tr. 524-25).

Gaines presented to the Emergency Department on November 13, 2022, complaining of bilateral lower back pain that worsens with movement, nausea, vomiting, and bloody urine, but denying diarrhea. (Tr. 339). She felt her symptoms were consistent with her recent experiences with kidney stones. (*Id.*). She reported having four to five lithotripsies over the past year or two to address her kidney stones. (*Id.*). An abdominal CT revealed bilateral nephrolithiasis including stone in the collapsed left renal pelvis and numerous bilateral intrarenal stones with no hydronephrosis or ureter stone and interval enlargement and more complex multicystic appearance of a 9.6cm right ovarian cystic mass with internal septations. (Tr. 342). At discharge, her clinical impression was ovarian cyst and urinary tract infection. (Tr. 343). At a December 6, 2022 appointment Gaines' knees, ankles, and feet were non-tender, and her knees and ankles were not swollen. (Tr. 516).

On February 14, 2023, Gaines attended a follow-up appointment with Vahid Tavakoli, M.D., for pericardium effusion, noting a history of endocarditis of mitral valve and palpitations. (Tr. 266). Her cardiovascular examination showed regular heart rate and rhythm, no murmurs or rubs noted, with bruits absent in the carotid arteries and abdominal aorta. (Tr. 269). She was

4

assessed with hyperlipidemia, unspecified type; endocarditis of the mitral valve; and hypomagnesemia. (*Id.*).

Gaines again presented to the Emergency Department on March 27, 2023, complaining of left-sided flank pain radiating to the abdomen that is worsened by movement. (Tr. 502). An abdominal CT showed bilateral nephrolithiasis with no obstructing ureteral calculus; mild lumbar spondylosis, a 2.2 x 1.1cm lipoma in the ileum; and marked peripheral groundglass opacities with cystic changes in the lower lobes bilaterally that could reflect chronic interstitial changes. (Tr. 506). Final impression at discharge included strain of lumbar region; lumbosacral degenerative joint disease; and kidney stone. (Tr. 510).

Gaines underwent an audiological evaluation due to her diagnosis of unspecified hearing loss, bilaterally, and her need for new hearing aids on March 30, 2023. (Tr. 501). An audiogram showed moderate to profound mixed hearing loss, bilaterally with word recognition classified as very poor (48% for the left ear, 44% for the right ear). (Tr. 501-02). The study was consistent with a 2017 audiogram other than the word recognition that had decreased significantly. (Tr. 502). She was fitted for new hearing aids on April 25, 2023. (Tr. 501).

At an April 15, 2023 office visit with Kimberly Brocklehurst, CNP, Gaines expressed that she was experiencing increased anxiety and depression due to stress levels at home. (Tr. 390). Her posture, gait, and stance were described as "normal." (Tr. 391). Gaines was evaluated for abnormal kidney function on May 1, 2023, and exhibited no lower extremity edema or tenderness, and denied nausea, vomiting, or diarrhea. (Tr. 500) She was assessed with glucosuria and microscopic hematuria; dipstick hematuria; insulin-dependent diabetes mellitus; and a history of lupus. (*Id.*). At a rheumatology follow-up appointment with Dr. Mains on May 17, 2023, a history of present illness included arthritis, asthma, Barrett's esophagus, cystitis,

duodenitis, fibromyalgia, history of HPV infection, hypothyroidism, irritable bowel syndrome, interstitial cystitis, kidney stone, mental disorder, NASH, thyroid disease, and ulcerated colon and was there for evaluation of systemic lupus/psoriatic arthritis. (Tr. 492). She noted worsened generalized pain, increased irritability and depression, with pain in her lower back, wrists, elbows, and ankles. (*Id.*). She had morning stiffness that generally lasted 30 to 45 minutes. (*Id.*). She was negative for joint swelling or weight change. (*Id.*). She was assessed with systemic lupus; SpA (enteropathic/psoriatic arthritis) overlap; chronic low back pain; fibromyalgia; and NASH with fibrosis. (Tr. 495).

Gaines returned to the Emergency Department on May 21, 2023, with a chief complaint of epigastric abdominal pain with some nausea and vomiting. (Tr. 301). An abdominal CT showed stable nonobstructing bilateral renal calculi; interval hysterectomy and appendectomy; and stable hepatosplenomegaly. (Tr. 313). She was assessed at discharge with abdominal pain and elevated lipase. (Tr. 305).

Gaines attended a behavioral health session with Michelle Monfort, LISW-S on May 23, 2023, where her active problems were noted to include Cushing's syndrome; diabetes mellitus type II; benign essential hypertension; generalized anxiety disorder; hepatomegaly; hypothyroidism; major depression, recurrent, moderate; splenomegaly; unspecified abdominal pain; and unspecified asthma, uncomplicated. (Tr. 371). She expressed an interest in switching from her current medication of Effexor to Cymbalta. (*Id.*). She indicated that her appetite was normal, her energy level was fair, and she was not experiencing anxiety, sleep disturbances, or easy distraction, but she did feel depressed. (*Id.*). It was again noted that her posture, gait, and stance were normal. (Tr. 374).

6

On May 24, 2023, Gaines attended an office visit with Jennifer Merill, M.D., of BV Endocrinology and Diabetes Specialists of NW Ohio for consultation for type II diabetes mellitus, hypertriglyceridemia, and hypothyroidism. (Tr. 434-39). Dr. Merill indicated that Gaines had started on glargine insulin in November 2020, and started on Trulicity in August 2021. (Tr. 434). Gaines was experiencing complications of diabetes including peripheral neuropathy and neuropathy with albuminuria. (*Id.*).

At a follow-up visit for her elevated lipase and abdominal pain with Sheri Miller, APRN-CNP, of Gastroenterology of West Central Ohio, Gaines reported that the pain had been increasing for about a week, and that she was vomiting every time she ate. (Tr. 485). She also reported chronic diarrhea, and CNP Miller noted she had lost 30 pounds since her most recent visit in 2020. (*Id.*). CNP Miller referred Gaines for a EGD with biopsy that was performed on June 2, 2023, and produced findings of gastritis and noted a history of Barrett's esophagus. (Tr. 482). Biopsies taken from the EGD showed gastric mucosa with no specific abnormality, benign reactive squamous hyperplasia with mild chronic inflammation consistent with gastroesophageal reflux, and mild chronic carditis. (Tr. 712). The biopsies were negative for intestinal metaplasia, granuloma, atrophy, dysplasia, malignancy, Helicobacter organism, or intestinal metaplasia. (*Id.*).

At an office visit with CNP Miller on June 27, 2023, Gaines complained of ongoing epigastric pain, nausea, and vomiting, so CNP referred Gaines for further testing for gastroparesis. (Tr. 1098). Gaines had a renal ultrasound on July 29, 2023, which revealed bilateral nonobstructive nephrolithiasis (Tr. 865), and a gastric emptying study on August 31, 2023, that showed no evidence of delayed emptying (Tr. 931-32). She again reported daily

7

vomiting and nausea, although her symptoms were somewhat controlled with medication. (*Id.*). She denied constipation, diarrhea, melena, or hematochezia. (Tr. 932).

Gaines had also visited with Melissa Maag, CNP, on August 1, 2023, to discuss her depressive symptoms that were being driven by family issues and her growing stress over losing her health insurance. (Tr. 1050). At a consultative examination with Melissa Lanza, Ph.D., on September 18, 2023, Gaines reported a history of sexual abuse as a child, as well as anxiety and depression that began in her mid-20's. (Tr. 904-05). She had been prescribed buspirone and Cymbalta by her primary care physician, but still experiences crying spells, feeling overwhelmed, panic attacks, and feelings that other people would be better off if she were not around. (Tr. 905). Dr. Lanza diagnosed Gaines with major depressive disorder, recurrent, moderate, and generalized anxiety disorder with panic symptoms. (Tr. 907). Gaines met with Michelle Monfort, LISW-S, on December 4, 2023, and was tearful as she again described family and financial issues that were affecting her mental health. (Tr. 1030).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewing Opinion Evidence

On August 12, 2023, state agency reviewing physician James Cacchillo, M.D., opined that Gaines was capable of performing work at the light exertional level, with the additional limitations that she could occasional climb ramps, stairs, ladders, ropes, or scaffolds; she could frequently balance, stoop, kneel, crouch, or crawl; she should avoid even moderate exposure to noise or work hazards; and she should avoid concentrated exposure to fumes, odors, dusts, gases,

poor ventilation, etc. (Tr. 61-62). State agency reviewing physician Abraham Mikalov, M.D., affirmed Dr. Cacchillo's opinion on January 30, 2024. (Tr. 71-72).

On October 20, 2023, state agency reviewing psychologist Kevn Lauer Ph.D., opined that Gaines had moderate limitations in the domains of concentration, persistence, and maintaining pace, and adapting and managing oneself, and mild limitations in the domain interacting with others. (Tr. 59). Dr. Lauer further opined that Gaines had moderate limitations in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (Tr. 63-64). State agency reviewing psychologist Ken Lovko, Ph.D., affirmed Dr. Lauer's opinion on January 31, 2024. (Tr. 70).

### 2.     Consultative Examination Opinion Evidence

On September 18, 2023, Dr. Lanza opined that Gaines appeared able to understand information discussed without difficulty, and that her long- and short-term memories were as expected for her age. (Tr. 908). Dr. Lanza further opined that when Gaines experiences mental health symptoms her abilities in the domain of maintaining attention, concentration, persistence, and pace would be limited. (*Id.*). Dr. Lanza noted no apparent limitations in the domain of interacting with others and wrote that Gaines did not report limitations in her ability to respond to work pressures. (Tr. 908-09).

### D.     Administrative Hearing Evidence

Gaines testified before an ALJ on August 28, 2024. (Tr. 36-47). Gaines testified that she lived in a house with her husband and ten-year-old son, that she was 5'4" tall and weighed 174 pounds, and that she had earned a high school diploma and attended some college. (Tr. 37). She

has a driver's license but is required to wear glasses when driving, and is unable to drive at night due to her glaucoma. (Tr. 38). Gaines stated that suffers from arthritis and has inflammation throughout her body, including her joints, muscles, and organs. (*Id.*). Her muscles tend to "charley horse" or cramp, and she constantly feels like something is crawling on her. (*Id.*). She is unable to lift her 21-pound granddaughter, mostly due to three slipped discs in her back. (Tr. 39).

Gaines further indicated that she has been diagnosed with lupus, psoriatic, rheumatoid arthritis, fibromyalgia, gout, diabetes, and Raynaud's syndrome. (*Id.*). Her doctor has told her she may have a pericardial infection, and she is taking preventive medications for it. (*Id.*). She also has chronic diarrhea due to irritable bowel syndrome and will visit the restroom anywhere from 12 to 18 times daily depending on what she eats. (Tr. 39-40). She does not leave home often because she may have accidents and must wear an adult diaper. (Tr. 40). She takes metformin and Jardiance to treat her diabetes, and she requires hearing aids. (*Id.*).

As for her mental health, Gaines testified to having a lot of anxiety, and stated she gets very nervous around other people. (*Id.*). She feels depressed thinking about the things she should be able to do but cannot. (Tr. 41). Some days she feels less depressed when sees her grandchildren, but those days are infrequent because of the potential of exposure to germs. (*Id.*). She has days where she does not get out of bed at all. (*Id.*).

Gaines testified she will not shower or bathe unless her husband is home because of the risk of falling. (Tr. 42). She mostly uses a cane to get around, but she will use a walker on occasion. (*Id.*). She will try to do the dishes and the laundry, and she keeps a chair near the stove, counter, sink, and washer so she is able to do some household chores. (*Id.*). She generally spends most of her day alternating between using the restroom and sleeping. (Tr. 43). She tried medications to help control her bathroom urgencies, but it caused her to vomit so she stopped.

10

(Tr. 45). With all of her health issues, her weight has dropped from 243 pounds to 174 pounds. (*Id.*). Gaines stated she is only able to stand for about 15 minutes at a time, and she is capable of maybe walking a block, but might need to rest or have a restroom break to ambulate that distance. (Tr. 46-47).

Once Gaines' testimony concluded, VE Suman Srinivasan testified. (Tr. 47-52). Gaines had no past relevant work for the VE to classify. (Tr. 48). For her first hypothetical, the ALJ asked the VE to consider an individual of the same age, educational background, and work experience as Gaines who was capable of performing light work with the following limitations: the individual would be able to tolerate occasional ramps or stairs but should avoid ladders, ropes, or scaffolds; could frequently balance, stoop, kneel, crouch, or crawl; should avoid hazards including moving machinery, heavy machinery, and unprotected heights; should avoid concentrated exposure to extreme odors, dust, gases, and other pulmonary irritants; should avoid concentrated exposure to extreme loud noises such as those found at a rock concert; should be able to tolerate simple, routine tasks that do not require any pace rate work or strict production quotas; and should be able to tolerate occasional changes and occasional decision making. (*Id.*). The VE opined that such an individual could work as a store cashier, DOT 211.462-010, light and unskilled, with 455,000 jobs in the nationally; as a sales attendant, DOT 299.677-010, light and unskilled, with 175,000 jobs nationally; and as a counter attendant, DOT 311.477-014, light and unskilled, with 135,000 jobs nationally. (Tr. 49).

For her second hypothetical, the ALJ asked the VE to consider all the same circumstances of the first hypothetical, except that this individual would be able to tolerate standing and walking for four hours of an eight-hour workday, could sit for six hours of a workday, and would be off task for up to five percent of the workday. (Tr. 49). The VE opined

11

that such an individual could perform work as a collator operator, DOT 208.685-010, with around 30,000 jobs nationally; as a merchandise marker, DOT 209.587-034, with around 40,000 jobs nationally, which is a reduction down from 140,000; and as a routing clerk, DOT 222.687-022, with around 40,000 jobs nationally, which is a reduction down from about 140,000. (Tr. 49-50).

For a third hypothetical, the ALJ asked the VE to consider all the same circumstances from the second hypothetical, except that the individual would be absent from work two or more days per month and off task greater than 15 percent of the workday. (Tr. 50). The VE opined that those limitations would preclude all work. (*Id.*). Under questioning from Gaines' attorney the VE opined that anything over ten percent off task is work preclusive, as is more than one unscheduled absence per month. (Tr. 51-52).

## IV. The ALJ's Decision

In her decision dated September 24, 2024, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since June 16, 2023, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following medical impairments: systemic lupus; fibromyalgia; psoriatic arthritis; asthma; diabetes mellitus, Type 2; Barrett's esophagus; irritable bowel syndrome (IBS); obesity; depressive disorder; anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally climb ramps and stairs; should avoid ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch and crawl; should avoid hazards including moving machinery, heavy machinery, and unprotected heights; should

12

avoid concentrated exposure to extreme odors, dusts, gases, and other pulmonary irritants; should avoid concentrated exposure to extreme loud noises such as that found at a rock concert; can tolerate simple, routine tasks that do not require any pace rate work or strict production quotas; can tolerate occasional changes and occasional decision-making; can tolerate standing and walking 4 hours in an 8-hour day and sitting 6 out of 8 hours; would be off task 5% of the workday.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on February 13, 1979, and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964)

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 16, 2023, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-28).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

13

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.      Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Gaines argues that the ALJ's RFC determination is unsupported by substantial evidence, specifically questioning whether the ALJ properly explained the findings that Gaines would be off task only five percent of the workday and could stand and walk for a total of four hours in an

15

eight-hour workday. (ECF Doc. 7, p. 9). Gaines contends that the ALJ failed to evaluate the limitation of being off task other that naming it as such in the bolded RFC finding, an abdication of the ALJ's responsibility to allow a reviewing court to trace the path of her reasoning. (*Id.* at p. 10). Gaines acknowledges that the ALJ referenced the findings of the state agency reviewing psychologist relative to the domain of concentration, persistence, and pace, but notes that those opinions gave no specificity to the time Gaines would be off task. (*Id.* at pp. 11-12). She also notes that the ALJ found the opinion of the consultative examiner persuasive as it "was generally consistent with the overall evidence which demonstrates limitations with task completion primarily due to medical symptoms," but argues that a citation to the entire medical record does not provide the specificity needed for meaningful review and does not establish the basis of a finding of five percent off task. (*Id.* at p. 12). Further, Gaines asserts, the ALJ failed to give the term "frequent" its proper vocational connotation when used in the context of required breaks, and did not explain why frequent breaks were not included in the RFC when she had found the consultative examiner's opinion mostly persuasive. (*Id.* at pp. 12-13). As the VE testified that employers would not tolerate off task behavior beyond 10 percent of the workday, this failure was particularly harmful to Gaines. (*Id.* at pp. 14-15).

Gaines further argues that the ALJ failed to explain the basis for the standing and walking limitations, and did not provide a connection between the evidence and the conclusion that Gaines could stand and walk for a total of four hours out of an eight-hour workday. (*Id.* at p. 15). Gaines contends that the ALJ disregarded her testimony concerning her ability to stand and walk and instead relied on records unrelated to that question to determine that she was capable of standing and walking for four hours. (*Id.* at p. 16). This was a critical issue, according to Gaines, because the VE did not cite jobs at the sedentary level that could be performed in her testimony,

so it is unclear whether there would have been viable work at step five of the sequential evaluation. (*Id.*).

The Commissioner responds that when the ALJ established the percentage of time Gaines would be off task, she considered the vague terminology of the consultative examiner's opinion and translated that into a concrete limitation of five percent based on the evidence in the record and the consultative examination notes. (ECF Doc. 8, p. 6). The ALJ similarly tempered the opinions of the state agency reviewing physicians with regard to standing and walking restrictions to account for Gaines' subjective statements regarding her capabilities. (*Id.* at p. 7). The Commissioner contends that this reframing of limitations for clarity is within the ALJ's authority and does not rise to the level of error. (*Id.*).

The Commissioner further argues that it is not incumbent on the ALJ to explain why she did not include different limitations with regard to time off task of limitations on standing and walking because there is no legal authority requiring the ALJ to articulate reasons for not including other hypothetical limitations. (*Id.* at pp. 7-8). This is particularly true because, in the Commissioner's view, Gaines' argument is not tethered to a medical opinion suggesting greater limitations were required. (*Id.* at p. 8). While Gaines wrote that the consultative examiner opined that Gaines required frequent breaks, the Commissioner avers that the examiner merely noted that Gaines reported a need for frequent breaks, rather than adopting that as her own opinion. (*Id.*). Further, while Gaines points to her own subjective reports of symptoms as support for a need for greater restrictions, the Commissioner notes that the ALJ went to great lengths to explain how those subjective reports were inconsistent with the medical evidence and thus provided substantial evidence to undergird her RFC determination. (*Id.* at pp. 9-10).

### a. Off task determination.

As noted above, the standard for substantial evidence is not a high threshold for sufficiency, requiring only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154. The ALJ has exceeded this standard regarding her analysis to Gaines' time off task. First, the ALJ addressed Gaines' allegations that she would be excessively off task due to a need for frequent restroom breaks, by noting that the medical evidence "did not support the frequency of symptoms or degree of limitation alleged by the claimant." (Tr. 24). The ALJ further wrote of several office visits when Gaines denied incontinence, diarrhea, or abdominal pain at exams, as well as a gastric emptying study that showed no evidence of gastroparesis. (*Id.*). The ALJ also referenced an August,2023 office visit where Gaines reported intermittent abdominal pain, reflux, hemorrhoids, and nausea but denied any other GI issues. (*Id.*). Finally, the ALJ found the opinions of the state agency medical consultants persuasive but added a limitation relating to time off task to the RFC based on Gaines' "subjective reports regarding her bowel issues." (Tr. 25-26).

The ALJ also properly considered the impact of Gaines' mental health when formulating the off-task time restriction in the RFC. The ALJ noted that Gaines had seen improvement in her panic attacks since starting her medication and had found Buspar to be "really helpful." (Tr. 25). The ALJ also referenced that Gaines' symptoms were situational, mostly arising out of family and insurance related issues, and that "she was always doing things for other people," suggesting she was able to manage her affairs effectively. (*Id.*). The ALJ wrote that the consultative examination notes indicated:

> [N]o sign of depressed mood, agitation, anger or mania was observed and the claimant's speech was of normal rate and volume and easily understood. She was noted to have sufficient insight and judgment and reported being able to make good decisions, taking the time to think things

18

> through. In addition, she was able to correctly answer a number of questions including a serial 3 task and spelling "WORLD" backwards. The examiner noted that the claimant was a good historian overall.

(*Id.*). The ALJ found the opinion of the consultative examiner to be mostly persuasive but felt compelled to define the vague statement that Gaines "would be limited in maintaining attention, concentration, persistence and pace" in more concrete vocational terms, and in a manner consistent with the other evidence in the record noted above. (Tr. 25-26).

The conversion of the language in a medical opinion to vocationally relevant terminology in the RFC is an appropriate exercise as an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Even where an opinion is found persuasive, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[ ] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Here, the ALJ clearly evaluated the evidence in the record, and utilized it to convert the vague findings in the consultative examiner's opinion into a vocationally relevant RFC. In so doing, the ALJ created a logical and accurate bridge from the evidence to the RFC, allowing subsequent reviewers the ability to grasp her reasoning.

Gaines further contends that "it is unclear what evidence supports the ALJ's finding regarding the time off task and why the record supports the specific percentage of 5% adopted in the RFC finding." (ECF Doc. 7, p. 11). Gaines further wrote that "it remains a mystery what evidence supports the ALJ's quantitative findings regarding time off task and why the record supports the specific percentage of 5% adopted in the RFC finding." (ECF Doc. 11,pp. 1-2). Despite her claims otherwise, Gaines' framing essentially would require the ALJ to articulate

why it would not have been more appropriate to determine she would be off task 10, 15, or some other greater percentage of the time, which necessarily requires proving a negative. As in *Snyder v. Comm'r of Soc. Sec.,* Case No. 3:25-cv-1219, 2026 WL 364319 (N.D. Ohio, Feb. 10, 2026), a directly analogous case, Gaines has cited no legal authority that requires an ALJ to articulate reasons for not including hypothetical limitations, such as varying percentages of time off task, when assessing the RFC. While the ALJ would be required to explain why she would reject certain limitations that may have been offered in a medical opinion, pursuant to 20 CFR § 416.920c(a), here, as in *Snyder*, Gaines' argument is untethered to any opinion. Beyond the vague statement offered by the consultative examiner that Gaines would be "limited in maintaining attention, concentration, persistence and pace," there is no indication by a medical expert of any specific percentage of time that she would likely be off task. Accordingly, the ALJ is not required to explain why she did not choose some other hypothetical percentage of time off task for the RFC, and this argument fails.

### b. Limitations on standing and walking.

Gaines also claims that the ALJ failed to explain the basis for the limitation in the RFC to four hours standing or walking. (ECF Doc. 7, p. 15). But again, here the ALJ has exceeded the substantial evidence threshold in her analysis. The ALJ considered Gaines' testimony that she was unable to lift her 21-pound granddaughter, could stand for no more than 15 minutes or walk a block, and often relied on a cane or walker for ambulation. (Tr. 23). The ALJ also wrote that the medical records included no EMG findings that supported her reports of neuropathy in her feet, and that she was noted at exams to have normal gait, stance, and posture, and had no tenderness or swelling in her knees and ankles. (Tr. 24). In finding the state agency medical consultants' opinions persuasive, the ALJ noted that their common restriction to six hours

20

standing or walking during the workday was "consistent with the overall evidence, including medical examination findings and the claimant's limited and conservative treatment for her conditions, and her report of daily activities such as driving, sharing household duties and taking care of children/grandchildren." (Tr. 26). Still, the ALJ found greater restriction on walking and standing than those opined by the state agency consultants owing to Gaines' testimony regarding swelling in her muscles, joints, and organs. (*Id.*). This articulation provides a reviewer with a logical and accurate bridge from the evidence to the limitations in the RFC pertaining to standing and walking. Further, it was no more necessary here than in the analysis regarding time off task for the ALJ why to explain why she did not select other hypothetical restrictions on standing or walking that are untethered to a medical expert opinion. This issue therefore does not countenance remand.

## VII.  Recommendation

Because the ALJ applied proper legal standards and supported her decision with substantial evidence, I recommend the Commissioner's final decision denying Gaines' application for SSI be affirmed.

Dated: June 8, 2026

Reuben J. Sheperd
United States Magistrate Judge

21

---

## OBJECTIONS

### <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)